IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>v. )<br>)    **Criminal No. 1:22-cr-00015-APM**<br>**KENNETH HARRELSON** )<br>)<br>**Defendant** )<br>)<br>) | |

### DEFENDANT KENNETH HARRELSON'S MEMORANDUM OF LAW
### IN SUPPORT OF HIS MOTION TO SEVER TRIAL FROM *RHODES* GROUP

Defendant, Kenneth Harrelson, by and through undersigned counsel, and with great reluctance and respect, and with the best of hopes for the other co-Defendants prevailing in their trial, and with other defendants in full agreement with the necessity of filing this motion, hereby moves the Court to sever the trial of Kenneth Harrelson from the trial of the other co-Defendants in the *USA v. Rhodes* group, and offers this Memorandum of Points and Authorities in support of that motion.

1. The Defendants in the group have developed to a circumstance of what some call "antagonistic defenses." That is, the Defendants and their counsel have arrived at litigation strategies that are incompatible.

2. However, to the extent that the co-Defendants have consulted privately under a common interests arrangement and work product privilege, they would have to volunteer their different views or perhaps the Court could be informed *in camera.*

3. The Defendants' attorneys have had extensive opportunities to discuss the case and

plans for trial, consistent with individualized attorney-client privilege, and have thoroughly explored the anticipated presentation of the defense in the joint trial. The Defendants' counsel have been discussing their common interests at least since Stewart Rhodes was indicted.

4. There is a very real contrast of antagonistic defenses, mainly focusing on theories and ideas about how a jury will react to which aspects of the defense.

5. The disagreement now of "antagonistic defenses" is not about the innocence of the Defendants but the best way to present the defense case to have the jury understand that each and every one of the Oath Keepers Defendants is in fact not guilty of the charges.

6. Attorneys always make litigation choices about what points to emphasize, how to organize and present the information, and what themes out of a large universe of data are most likely to persuade a jury that a person is not guilty.

7. Now, the U.S. Attorney's Office (USAO) is understandably (and inevitably) pressing the Defendants on whether they will stipulate to the admissibility and authentication of a mountain of evidence including video records of events at the U.S. Capitol, most especially video recordings taken from the smart phones of private individuals and/or news media organizations which will not be admissible or authenticated by any blanket provision for admissibility of government surveillance video.

8. It was always a question to Harrelson and a few other attorneys – what happens if some of the Defendants stipulate to important evidence especially in large quantity while other Defendants refuse to stipulate? How does the Court proceed where

evidence has been entered by stipulation as to some Defendants, but not others?  How can that be done?

9. Counsel cannot reconcile how a group of Defendants can be tried together with inconsistent and incompatible positions on important issues like stipulating to or opposing the admissibility and authentication of massive quantities of key evidence.

10. The prosecution should receive an answer sooner rather than later, but there just is not consensus among these Defendants on whether to stipulate to some or all evidence.

11. Harrelson's counsel believes that it is best for his client to pursue that litigation strategy that both the prosecution and the defense be able to present all of their proposed evidence.  Harrelson's counsel wants to ensure and protect the government's ability to present its entire case the jury, and in reciprocal manner for Harrelson to make use of any relevant video recordings and evidence.

12. Harrelson's counsel anticipates that the prosecution's evidence will not prove what the USAO expects and will actually tend to disprove their allegations, because the undersigned counsel has spent an enormous amount of time painstakingly analyzing all of the video and evidence.  Counsel doubts that the USAO has been able to dig into the video recordings to the same level of detail and cross-comparison.

13. In trying to reach a consensus among the counsel for the Defendants in *USA v. Rhodes* it has now unfortunately become impossible, as it seems now, for all of the Defendants to come to the same position.

14. Counsel for the Defendants are of different litigation strategy views (all agreeing to the innocence of all of the Defendants) including about the presentation of evidence

in response to the Government's inquiries about stipulations.

15. Counsel for the Defendants are also of different litigation strategy views as to what points to lead with, emphasize, major on to best get the jury's attention and understanding.

16. The Court and Department of Justice should put this in the context that the grouping of Defendants within various cases was fairly arbitrary to begin with and not a result of any choice or actions by the Defendants. There is more that suggests one single case of over 900 Defendants than reasons to subdivide it, except of course the number of Defendants would be unmanageable. One could divide the cases according to those who did not enter the U.S. Capitol or those charged only with a federal version of trespassing in a restricted area. One could divide them according to the States they came from and travelled together as a group, such as the Oath Keepers all from Florida. The prosecution attempted to create a group of leaders, arguing that Thomas Caldwell was the mastermind of the Oath Keepers. But the facts as developed do not fit or support the grouping. For one thing, Harrelson and Caldwell never have met, are from different states and Caldwell is not an Oath Keeper. Rhodes is a compensated, founder and leader of the Oath Keepers, from Texas while Harrelson is volunteer. Harrelson, did not attend security meetings and made different fashion choices than other Oath Keepers. The government might see this as being "out of uniform." Harrelson is fundamentally different because he was on an active security detail when the coordinated attack began and continued up to and through the

Columbus Door. There is nothing that makes the grouping of Defendants necessary or compelling.[1] The grouping is artificial and arbitrary.

17. While we do not concede proper joinder, if the court finds otherwise, severance is still warranted under *Kotteakos v. United States*, 328 U.S. 750, 773 (1946). The Supreme Court in that case applied these principles in assessing the appropriateness of joinder of 34 defendants. 328 U.S. at 772-75. Ultimately the Court held that the defendants were improperly joined, *id.* at 774 *(emphases added)*, and specifically recognized the danger of prejudice where joinder has the tendency to falsely amplify the scope of criminal culpability:

> When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass. *Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group.*
>
> Criminal they may be, *but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it.* That way lies the drift toward totalitarian institutions. True, this may be inconvenient for prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth.

18. Furthermore, the Court rejected the government's argument that Rule 14 necessitates a consideration of the potential for joinder efficiencies that can override concerns

---

[1] The Court has mentioned and it has been discussed that – curiously – *only* 3 out of originally 20 Oath Keepers Defendants are in detention. But rushing these Defendants to a 40-50 year prison sentence that they do not deserve for charges of which they are innocent is less desirable than taking the time to get the case right.

about prejudice, and held that "[the government] too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials." *Id.* at 773.

19. The prejudice of a mass trial found by the *Kotteakos* Court are ever present here. Harrelson is charged by indictment with originally 20 other Defendants, now a first five Defendants facing trial without a single, common thread tying all of the defendants together. More specifically, there is a danger that the jury will associate each defendant with the collective conduct.

20. The Supreme Court has found that this concern is particularly pressing where, as here, much of the evidence is only admissible against one party. *Zafiro*, 506 U.S. at 539. *See also United States v. Erwin*, 793 F.2d 656, 666 (5th Cir. 1986) (concluding severance required because "[t]he charges against [defendant] were only peripherally related to those alleged against the other [co-defendants, and] [a]s the trial progressed, it became increasingly apparent that very little of the mountain of evidence was usable against her").

21. Here, the indictment majors on what unidentified, unspecified other people did like the crowd did this or the crowd said that. But it also suffers from mingling and confusing the actions of some Defendants unrelated to other Defendants.

22. Rule 14 of the Federal Rules of Criminal Procedure provides that "[i]f the joinder of defendants in an indictment . . . appears to prejudice a defendant . . . the court may . . . sever the defendant's trials, or provide any relief that justice requires." Fed. R. Crim. P. 14(a). "The first hurdle in obtaining a severance under Rule 14 is a showing of

prejudice. *United States v. Lane*, 474 U.S. 438, 449 n.12 (1986). Once prejudice is shown, the decision to grant a severance remains within this Court's discretion and the Court may exercise its discretion to sever the defendants even if it finds that they are properly joined. *See Zafiro v. United States*, 506 U.S. 534, 541 (1993); *United States v. Edelin*, 118 F. Supp. 2d 36, 41 (D.D.C. 2000). In making the decision to sever, courts consider the "weight, quantity, or type of evidence against the movant and against the other defendants . . . [emphasizing as] [t]he critical determination . . whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant." *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991). In *United States v. Sampol*, 636 F.2d 621, 642-648 (D.C. Cir. 1980), the D.C. Circuit recognized that a great disparity in the weight and quantum of the government's evidence can justify a severance. Specifically, the Court held that "not only the weight of the evidence, but also the quantity and the type of evidence [to be] adduced against co-defendants, is a vital consideration in evaluating the necessity for a severance. *Sampol*, 636 F.2d at 646. The court further held that "[t]o speak in terms of 'transference' or 'rubbing off' of guilt, classic expressions used to explain why severance is justified in a particular case, would be to downplay the prejudice that [the defendant] [would be] subjected to in a joint trial . . ." *Id.*

23. While courts have generally interpreted Rule 14 in favor of joinder, *see Zafiro* at 539, the Supreme Court has held that severance of properly joined defendants is appropriate where there are dangers for "transference of guilty from one [defendant] to another . . . subconsciously or otherwise, are so great that no one can really say prejudice to a substantial right has not taken place." *Kotteakos*, 328 U.S. at 750. *See*

*also United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991) ("[T]here are definite limits to what the government can put together in a single indictment."). Furthermore, courts in this District have noted that "such a risk is 'heightened' when, for example, 'many defendants are tried together in a complex case and they have markedly different degrees of culpability' or evidence 'that would not be admissible if a defendant were tried alone is admitted against a codefendant.'" *United States v. Franklin*, No. CR 04-128 (RMC), 2005 WL 8157514, at *2 (D.D.C. Dec. 16, 2005) (quoting *Zafiro*, 506 U.S. at 539).

24. To properly join two defendants in this District, the Government must sufficiently demonstrate "the existence of a common scheme or plan spanning both transactions *and* both defendants." *United States v. Perry*, 731 F.2d 985, 991 (D.C. Cir. 1984) (emphasis added). Though generally favored, joinder does not "authorize the Government to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all." *Kotteakos v. United States*, 328 U.S. 750, 773 (1946). Rather, each defendant must be logically relevant to each of their co-defendants. *See id.*; *see also Perry*, 731 F.2d at 990 ("[T]here must be a logical relationship between the acts or transactions within the series."); *see also United States v. Jackson*, 562 F.2d 789, 796 (D.C. Cir. 1977) ("[I]f acts were part of a common scheme or plan, or connected together, they could be regarded as a series.").

25. Mr. Harrelson's alleged actions were wholly separate and distinct from the joined co-Defendants, and thus, these parties are improperly joined. As in *Jackson*, "[h]ere, we are confronted with *dissimilar* and apparently unconnected crimes, and we are

provided with little or no indication of how or why defendants moved from one to the other. We know only that the crimes occurred at about the same time and about the same place." *Jackson*, 562 F.2d at 795. Unless the Government demonstrates a logical nexus between Harrelson and his co-Defendants, the Court must sever the proceedings. Furthermore, grouping the defendants into three random groups for trial is not sufficient to mitigate the prejudice caused by misjoinder.

26. Defendant is different from the other defendants because he made no statements leading up to or including Jan 6 that suggest he knew about, engaged in or agreed to any plan to engage in a seditious offense or a 1512 offense. He did not make any statements capable of being misconstrued and twisted to create the false impression suggested by the Government as to other Defendants.

27. It may be that the Government intends to introduce caches of weapons seized from other co-defendants where there were no weapons seized from Harrelson's cars or home and where FBI agents felt comfortable enough with Angel Harrelson to leave her with a rifle that was left in an unopened safe and a handgun (that was cleared) that had been left by agents on the living room floor that Angel Harrelson was able to be recover and properly store prior to the children returning from school.

28. On January 3, 2021, Kelly Meggs, having been persuaded days before by a retiring Florida head of the Oath Keepers to take over, persuaded Kenneth Harrelson to come to Washington, D.C. with other Florida Oath Keepers to do Congressional security details. Because the group was driving – spending very little money despite questions about funding – that meant that Harrelson's decision to join the travel was immediately prior to when the cars left Florida to arrive in Northern Virginia by

January 5, 2021. Harrelson went to DC and provided "gray team" security on January 5th.[2] That is, there was no time between when Meggs persuaded Harrelson to join the trip and the beginning of the travel by car to Washington, D.C.

29. Upset by some of the handling of the projects (disorganization, not suggesting that there was anything improper being done by the Oath Keepers), and after threatening to leave D.C. and boycotting a security meeting on the evening of January 5th, Harrelson woke up late on the 6th, after most Oath Keepers had left, showed up at the ellipse in a shirt and ball cap, and provided the last security detail of the day from the ellipse to the Capitol that had to be hurried out of the crowds by others while Harrelson, serving as lagging anchor with a woman who was having trouble keeping up, arrived approximately six minutes prior to a coordinated attack. The barrier attack was launched by others at breach points that bracketed the large crowd, that had formed up in the area, and it began at 1:58, approximately one hour prior to the first barrier attack. This coincided with the exit of the Vice Presidential motorcade.

30. Harrelson escorted VIPs to permitted demonstrations, trying to keep up with the VIPs he had been assigned to escort to the demonstration permitted site. His activities were driven by the VIPs some of whom bounded to the east steps amongst perhaps a thousand others that had been drawn in. Harrelson pursued the VIP's and tried to not

---

[2] The government has alleged Harrelson was engaged in surveillance and we have been seeking the surveillance video showing Harreslson at an officially sanctioned event to disprove yet another Government false assertion.

lose track of them.

31. Harrelson's defense depends on other things with an entirely different theory that is incompatible with the other defendants at this time, under these circumstances on this compressed timeline.

32. Defendant has never met Caldwell. Defendant met Watkins and Rhodes once prior in Louisville, Kentucky, when he attended an Oath Keeper effort to prevent rioting and property destruction.

33. The prosecution is based on the assumption that "a mob needs a leader" and that a brawl could not have broken out spontaneously on its own without being pre-planned and orchestrated. Defendant Harrelson agrees, to a point, but wishes to show through late-appearing top experts exactly what happened and why and present the actual plan that was in effect that will show that the Oath Keepers, most of all Harrelson, also were not involved or had guilty knowledge. As laid out in 225-1, 225-2 and 225-3 and as will be testified to by top experts who became known in the last two weeks, others did have a plan and it was the Oath Keepers—as an auxiliary force for law enforcement and medical providers for more than a decade—and police who were forced to respond to this illicit plan that has no known precedent.

34. It is anticipated that Harrelson's defense will not only prove his innocence, but it will, most certainly in the East of the Capitol where the Oath Keepers responded, in important respects, exculpate the government, including law enforcement agencies, police and almost all rally attendees.

35. Harrelson, by counsel, believes that on these facts and the available evidence there

was in fact a plan to orchestrate the very few people out of a crowd of 10,000 who brawled with police and engaged in a plan that used innocent rally attendees as "force multipliers" but the evidence proves that Harrelson and his co-Defendants had nothing to do with that advance planning. The attacks mostly began before the Oath Keepers reached the area, even prior to the Ray Epps breach. Its operational objectives were mostly completed by the time Oath Keepers entered the Capitol. The Oath Keepers had no contact with anyone before January 5, 2021, about organizing any violence, damage, or interference, and part of the plan of these loosely affiliated groups was to overwhelm and confuse any possible response by government law enforcement agencies, the Capitol Police or the Oath Keepers.

36. The evidence is unmistakable that those who caused problems were not any of the Oath Keepers. (Note: Far too much attention has been paid to established, structured organizations and not enough on clearly-identifiable groups which have no names or structures that we know of. This should not be thought of in terms of "brand names.")

37. All the evidence shows and all Defendants agree that if there was any plan or organization or leader on January 6, 2021, it was not by any of these Oath Keepers Defendants.

38. Faced with an apparent attitude by everyone in the Government and in the courts that these Defendants must prove their innocence and are presumed guilty, Harrelson's counsel has invested an enormous amount of time doing a deep dive into all the video recordings and all of the other evidence to fully understand exactly what happened everywhere around the 751-foot-long U.S. Capitol building and the surrounding 58

acres of Capitol grounds. This has been a grueling, exhaustive effort spanning much of 11 months.

39. But the benefit of this intensive review is that the undersigned has become intimately familiar with all of the video recordings and all of the evidence.

40. Based on extensive review, Harrelson's counsel concludes that Harrelson's best litigation strategy is to agree to all of the evidence on both sides as a presentation at trial, assuming that an unbiased jury evaluates the evidence dispassionately, logically, and diligently.

41. If all Defendants in unison do not jointly stipulate to the video recordings and other evidence, it will make a very significant difference in the conduct of the trial.

42. Video recordings from security cameras at the U.S. Capitol are the easiest for the Government to authenticate, but not entirely easy. There are more steps required than one might think. But of greater significance, the U.S. Capitol Police has been extremely sensitive to revealing any details of their surveillance systems. It is doubtful that the U.S. Capitol has surveillance system any more sophisticated (despite the building's size) than is common in large commercial applications today. But to introduce security camera video without a stipulation will require the Government to produce evidence about the brand and make and details of the Capitol's security camera system, which it has shown great aversion to disclosing.

43. Worse, however, would be authentication of the videos taken by private individuals or news organizations. That would require the person who actually took the video recording or photograph to come to court and testify to its origins, authenticity,

accuracy, and chain of custody or at least that it appears to be unchanged from when the operator recorded it.

44. "Buzz" embodying too much excitement is usually unreliable. Much buzz can be found that the Federal Rules of Evidence were recently amended to make it easier for digital evidence to be introduced in court. Unfortunately, notwithstanding the great excitement expressed of a brave, new world of digital information, Rule 901 and Rule 902 are far from clear as focusing on this point. And the changes if they are clearly relevant do not actually change the standards for authentication; they merely allow an affidavit instead of a live witness. But the affidavit must still meet all the same standards.

45. Thus, for the prosecution to proceed without a stipulation would still be a large task and a significant difference. Because of these logistical and evidentiary burdens that conflict with a full expression of what happened on January 6 where both sides can agree to permit admission to all the relevant evidence, Defendant Harrelson would be inclined to welcome all government evidence, video and statements—no matter how prejudicial--to streamline the presentation to the jury in all proper context. The fact that detailed video analysis of Harrelson and others, wholly exculpates Harrelson who made no misconstrued statements, and shows others carrying out the plan alleged against the Oath Keepers, means his defense strategy, assuming *arguendo* the government's misconstrued statements made by each of the others were true, logically, could only result in Harrelson's exoneration. This functions as a monkey wrench in the machine and efforts made to accommodate each camp of the defense prejudices both camps and guarantees a miscarriage of justice, particularly on this

compressed timeline where we do not have discovery yet.

46. Even if the individual owners of smart phones submit affidavits instead of attending live, all the elements of authenticating and introducing the video still must be satisfied.

47. Harrelson, by counsel, is understanding and sympathetic to the presiding judge's concerns about the Court's schedule and the available space in the courthouse, and the interaction of the two factors. These are tools that should be provided to the judge and staff.

48. Nevertheless, despite Judge Amit Mehta's strong explanations about the limitations of the Court's building and schedule, that is still not a sufficient reason to restrict the constitutional rights of the Defendants to a fair trial. Yes, it may present problems that defy easy solution and may create frustrating conflicts.

49. But when Defendants are facing up to 40 to 50 years in prison, the physical and scheduling problems shrink in comparison. To be inconvenienced while locked up for an extra year, only to be locked up for 50 years, is not a strong reason to short-change the Defendants' rights in obtaining a fair trial. It is scant benefit to go to trial a year early only to be sentenced to prison for up to 50 years.

50. It should also be considered that most of the work such as disclosures and discovery that is causing the pinch ought to be happening outside of the courthouse with little time or attention from the presiding judge, as long as it can run its course fully outside of Court.

THEREFORE, Harrelson, by counsel, respectfully requests that the Court sever Kenneth Harrelson from the artificial and arbitrary grouping of him with the other *USA v. Rhodes* Defendants, and try him separately.

Dated:  August 18, 2022              RESPECTFULLY SUBMITTED
                                     KENNETH HARRELSON, *By Counsel*

                                     /s/ Brad Geyer

                                     Bradford L. Geyer, PHV
                                     PA 62998
                                     NJ 022751991
                                     Suite 141 Route 130 S., Suite 303
                                     Cinnaminson, NJ 08077
                                     Brad@FormerFedsGroup.Com
                                     (856) 607-5708

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2022, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

                                     /s/ Brad Geyer
                                     Bradford L. Geyer, PHV
                                     PA 62998
                                     NJ 022751991
                                     Suite 141 Route 130 S., Suite 303
                                     Cinnaminson, NJ 08077
                                     Brad@FormerFedsGroup.Com
                                     (856) 607-5708