# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 1:22-cr-00015-APM** |
| **JOSHUA JAMES** | : | |

### DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

Joshua James, through counsel, files this position with regard to the sentencing factors espoused in 18 U.S.C. § 3553(a) and his advisory sentencing guidelines range. Mr. James has received and reviewed the presentence report ("PSR") with the assistance of counsel. He has no objections to the sentencing guidelines calculation in the PSR and no additional corrections[1] to the PSR. Mr. James stands before the Court for sentencing, having pleaded guilty to one count of seditious conspiracy, in violation of 18 U.S.C. § 2384, and one count of obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). The sentencing guidelines in this case are 27 to 33 months in prison. The defense anticipates that the government will recommended a modest downward departure pursuant to USSG 5k1.1. Under 18 U.S.C. § 3553(a), courts must also consider the several delineated factors in addition to the United States Sentencing Guidelines. For the reasons set forth herein, in the Presentence Investigation Report and appended Psychological Evaluation Report, in the sentencing mitigation video[2], and in the letters

---

[1] On November 28, 2024 defense counsel emailed the PSR writer and government a list of proposed factual corrections to the PSR.

[2] A notice of filing digital exhibit will be filed contemporaneously with this sentencing memorandum.

accompanying this memorandum, Mr. James asks the Court to impose a sentence of no more than three months incarceration followed by a term of supervised release.

## DISCUSSION OF 18 U.S.C. § 3553(A) FACTORS

### I. Mr. James's History and Characteristics

Joshua James grew up in a family that was fractured by abuse, neglect and addiction.[3] Seeking a sense of purpose and structure, he earned his GED and enlisted in the United States Army at the age of 18, serving as an infantryman in the combat arms branch. Because Mr. James did not complete high school, he was required to achieve a minimum score of 50 on the Armed Services Vocational Aptitude Battery (ASVAB), a standardized test used to assess aptitude and eligibility for military service. Although he scored a 47, the Army granted him a waiver. At the time (late 2005 - early 2006), there was significant concern about whether the Army would be able to meet its FY2006 recruitment goal, having missed its FY2005 recruiting goal by over 6,500 new recruits. *See* Kapp and Charles, <u>"Recruiting and Retention: An Overview of FY2006 and FY2007 Results for Active and Reserve Component Enlisted Personnel,</u>" <u>CRS Report for Congress</u>, Feb. 7, 2008, p.2. Ultimately, the Army was able to meet its recruitment goals for FY2006 by lowering test score requirements and raising age limits, but this controversial practice drew significant scrutiny due to mounting U.S. Troop casualties. *See, e.g.* "<u>Army tops recruit goal by lowering standards</u>", NBC News, Oct. 9, 2006 (last visited Dec. 3, 2024) ("The U.S. Army recruited more than 2,600 soldiers under new lower aptitude standards this year, helping the service beat its goal of 80,000 recruits in the throes of an unpopular war and mounting

---

[3] The details of Mr. James's childhood trauma are set forth in detail in the Psychological Evaluation (p. 3-5) and the PSR (¶193-197).



casualties."). News reports[4] show that the Army justified its decision to lower test score standards by claiming that each of the new FY2006 recruits with low scores had received high school degrees. That was not the case for 18 year-old recruit Joshua James.

James served as a private in the infantry. In March of 2007, two months after President George W. Bush ordered a troop surge in Iraq[5], James was deployed to Bhagdad. His main duties consisted of patrolling the area on foot and driving through Main Supply Route ("MSR") Tampa to locate, detonate, and clear the route of any roadside bombs. At 19, he suffered brain damage and nearly lost his life in Iraq when a suicide bomber drove a dump-truck full of explosives into a concrete overpass that James and his unit were occupying.[6] According to military medical records: "[a] vehicle-born IED was driven in and detonated, fatally dismembering three team-mates near him. The concrete roof collapsed on him, fracturing his face in several places." He lost consciousness

---

[4] *See* "Army tops recruit goal by lowering standards", NBC News, Oct. 9, 2006 (last visited Dec. 3, 2024) ("The Army said all the recruits with low scores had received high school diplomas").

[5] *See* President's Address to The Nation, January 10, 2007 (available at: https://georgewbush-whitehouse.archives.gov/news/releases/2007/01/20070110-7.html).

[6] *See* Exhibit 1 (Hanley, Charles, *Blast Downs Highway Span*, Spokesman-Review, June 11, 2007).

for several minutes and was eventually "medevaced to a Baghdad hospital, which was mortared the same day, throwing him from the gurney face-first onto the floor."

For his wartime service in Iraq, he was awarded the Purple Heart, the Combat Infantryman Badge, the National Defense Service Medal, the Global War on Terrorism Service Medal, the Iraq Campaign Medal, and the Army Service Ribbon.

James's recovery was a slow process that required multiple reconstructive surgeries. Over the next two years, his body slowly healed, but his career in the Army came to a disappointingly abrupt end. His sense of purpose and self-worth were replaced by feelings of guilt for not finishing his deployment and regret over a military career cut short. Suffering from traumatic brain injury (TBI), severe post traumatic stress disorder (PTSD), anxiety, and depression, he struggled to adapt to post-military life. Dr. Guarnera discusses Mr. James's PTSD in her report:

> Multiple sources described severely impairing posttraumatic and mood symptoms following his combat injury. VA records from 2012 document nightmares, flashbacks, social isolation, mood instability, racing thoughts, and shame (i.e., due to his failure to complete his deployment). Mr. James and his wife described significant "survivor's guilt" over surviving the blast while others in his unit did not…

> The PTSD symptom cluster of *hyperarousal* appears to be a particular feature of Mr. James' illness. Because traumatic events are life-threatening, trauma-exposed individuals can become perpetually alert and on edge as a way of attempting to protect themselves from future threats. This chronic state of hypervigilance and body tension can result in anger, irritability, aggression, sleep problems, and reckless behavior— which are all classic PTSD symptoms. In this vein, VA records describe Mr. James as "always on guard" and "restless, scanning [his] environment." Further, records indicate he tended to erupt in anger and hostile displays when he "feels triggered." The most triggering situations involve loud, chaotic, or crowded environments when he feels less able to detect and defend himself against potential threats (e.g., "reacting visibly to screams and noise"; triggered by "crowded places with unpredictable behaviors of others"). Records describe him avoiding crowded places and experiencing panic symptoms (i.e., shortness of breath, racing heart, chest tightness) "in the context of suddenly being in a crowd... Mr. James and his family corroborated that these hyperarousal symptoms have continued to the present day. He remains excessively vigilant for danger, easily startled, and quick to become angry or take defensive action when he feels he or others might be in danger."

Adjusting to civilian life after medically retiring from the Army proved difficult for James. He eventually moved to Florida, where he met his current wife, Audrey James. He attended dive school in Florida and sought vocational training in welding in order to pursue a new career, but his persistent PTSD symptoms made it challenging for him to thrive in a civilian employment setting. In 2016, Joshua married Audrey and became a step-father to her two children. Despite a happy home life, Joshua was still searching for purpose in his professional life.



In or around 2017, Mr. James became interested in the Oathkeepers organization. It portrayed itself as being founded by former military personnel, law enforcement, and first responders, which appealed to him, as did the organizations commitment to providing national disaster relief work. James viewed it as an extension of his abbreviated Army career, a way to give back to the community, and a way to regain a sense of purpose in his life. He also felt a sense of community being among men with shared combat and military experience that he could relate to. His early involvement with the organization was limited to humanitarian relief work. In his wife's words:

> I think he felt important when he was part of the Oath Keepers.... That part of him missed being in the military—that sense of brotherhood and responsibility.... He really liked feeling involved and part of something bigger than himself. He loved helping.[7]

---

[7] Exhibit 2 (Psychological Evaluation p.10)

When Hurricane Irma struck the Florida Keys. James traveled to the impacted areas and assisted in relief operations with the organization over the course of seven days. After returning home, his connection to the organization faded and he fell out of contact with the group. Mr. James and his family sold their house and moved to Alabama to be closer to Audrey's family. Around this time, James started his own power washing business and in 2018, Audrey gave birth to their son, Wyatt James.



In her letter to the Court[8], Audrey James offers insight into Mr. James as a husband and as a father to their six year old son, Wyatt (who recently dressed up as a welder, like his dad, for Halloween). Mrs. James, who has known her husband for 18 years, writes "[t]he actions that led to this case are out of  character for the man I know. I have seen the deep regret and guilt that he feels. …He has shown remorse not only through his words but also through actions that reflect his desire to change such as attending church as a family, becoming more engaged in his faith and attending regular counseling sessions." Mr. James's childhood friend and fellow combat veteran, Anthony Hernandez, echoes these sentiments in his letter.[9] And, Mr. James's employer, Service Steel, Inc., (who, judging by the above photo, may already have son Wyatt on their recruitment radar) describes him as "an outstanding employee" who "is always ready to assist fellow employees or customers and goes above and beyond."[10]  A common theme among the letters to this Court from those who know Mr. James best is his genuine remorse and growth. The Joshua James that stands

---

[8] See Exhibit  3 (Audrey James letter).

[9] See Exhibit 4 (Anthony Hernandez letter).

[10] See Exhibit 5 (Service Steel letter).

before the Court today is a noticeably different person than he was four years ago when this offense was committed.

## II. Nature and Character of the Offense

Mr. James's actions in furtherance of the conspiracy are described in detail in the Presentence Report ("PSR") (Doc. 902, PSR, ¶¶56-102) and the Statement of Offense (Doc. 60). Therefore, rather than recount the offense in full, the defense provides the following additional facts and insights, focused on four specific areas.

### A. Involvement with Oathkeepers

In mid November 2020, James was not actively affiliated with the Oathkeepers when he attended the Million Maga March in Washington, D.C., where he first met Roberto Minuta. James attended the rally because he was providing security detail and protective services work for a different organization, First Amendment Praetorian.[11] At the time, James was not very politically involved and had not attended a rally. In his own words, he was looking for any and every opportunity to do something, to be a part of something. While there, he noticed Mr. Minuta because of the Oathkeepers hat that Minuta was wearing. The two struck up a conversation and James told Minuta about his earlier affiliation with the Oathkeepers. The new acquaintanceship motivated James to reengage actively with the organization.

---

[11] According to its founder, Robert Patrick Lewis (a former United States Army Green Beret, Purple Heart and Bronze Star recipient), First Amendment Praetorian was founded in September of 2020 to "provide pro bono security and protective services at grassroots events" to "ensure that every American can freely associate, freely gather and freely speak on matters of public concern to them without threat or fear of intimidation, retribution, bodily harm or death." *See Lewis v. Abramson,* 1:22-cv-126, Doc. 16.

In December, James attended another rally in Washington, D.C., again serving as a member of a private security detail. James enjoyed the security work, which "made him feel competent, valued, and protective. However, [it] exacerbated his already severe PTSD-related hyperarousal, since security work required extreme alertness to potential dangers. He described himself as feeling 'overextended' when working security, with his hypervigilance 'at its peak.'"[12]

James, who was 33 at the time, admired and looked up to the organization's well-spoken and Yale Law School-educated leader, Stuart Rhodes (21 years older than James). Though in James's words, he "sometimes felt like an idiot" when talking to Rhodes, often struggling to follow Rhodes's diatribes which were full of overly complex arguments and tangents that left James more confused than informed.

James's traumatic brain injury ("TBI") and related mental health conditions made him particularly vulnerable to Rhodes's influence. As noted in the Psychological Evaluation: "VA records indicate that Mr. James' ADHD-related deficits in attention, concentration, processing speed, and distractibility worsened because of the traumatic brain injuries he suffered during his deployment... Neuropsychological testing conducted in 2007 and 2012 revealed problems with memory, verbal fluency, abstract reasoning, and executive functioning (e.g., the ability to monitor his own thinking and inhibit impulses)."[13] Mr. James's family also described him as "highly dependent on others' affirmation," noting that "leaving the military left James insecure

---

[12] Exhibit 2 (Psychological Evaluation, p. 11).

[13] Exhibit 2 (Psychological Eval, p.8).

and prone to overcompensate, seeking out roles where he could serve as a protector to feel important and useful."[14]

Rhodes tasked James with attempting to get the defunct Alabama chapter of Oathkeepers back up and running; a job that James had little success with, as he only managed to recruit a handful of individuals. Over the ensuing weeks, James became more indoctrinated into the organization and its politically charged rhetoric and dialogue. As January 6 grew closer, Rhodes's hyperbole intensified. Though James did not follow all of the rhetoric and arguments that Rhodes advanced, he was convinced that the election was stolen and he was prepared to use force to stop the transfer of power in the event that President Trump invoked the Insurrection Act.

B. Leadership Role

Pursuant to the terms of his plea agreement, Mr. James has admitted to and accepted a role enhancement for his role as a manager or supervisor. Unlike Rhodes, or even Kelly Meggs, James's managerial role was akin to a small group or team leader;[15] one who takes orders from superiors and implements them, but has no real power or decision making authority.

James's enhanced role in the conspiracy consisted of little more than relaying and implementing directives that he received from others in the organization. By way of example, on January 6, James gathered and advised the members of his security detail team that they were headed to the Capitol. He did so because Michael Green called James and instructed the men to get to the Capitol. James, in turn, relayed the directive to his security detail team. One person

---

[14] Exhibit 2 (Psychological Eval, p.10).

[15] Although James was considered the head of the Alabama chapter of the Oathkeepers, the chapter had only a few members.

chose not to go; others, like Minuta, enthusiastically agreed. Once on Capitol grounds, James physically was the first member of his group to enter the building, but as they walked the grounds toward the building it was Minuta leading the way. James did not direct anyone to enter the Capitol.[16] When he entered, he was accompanied only by Minuta and Walden. A short while later Grods and Ulrich entered the building on their own.

In a similar vein, on January 8, James received a chat message from Oathkeeper attorney Kellye Sorelle advising:

> "Stewart: You all need to delete any of your comments regarding who did what. You are under zero obligation to leave them up. You/we have not gotten a preservation order instructing us to retain those comments, so delete them. I can't delete them because this is a legacy Signal chat that doesn't let me delete comments. Only the comment author can delete a comment. Get busy. Delete your self-incriminating comments or those that can incriminate." Says, "Start now." [PSR ₱ 98]

Only after receiving this directive did James forward it to Grods and Ulrich, informing them to delete all their communications. [PSR ₱ 99].

The fact that James was largely uninvolved with the planning of January 6 — apart from leading the security detail for Roger Stone - is also illustrated in cell phone footage, captured by other January 6 defendants, which the government provided in discovery. Two videos provided to the defense on August 12, 2021 were described by the government, in an email dated the same day, as follows:

> defendants Hackett, Walden, Minuta, James, Ulrich, Grods [are] standing near the Washington Monument. In the first video, IMG_1542, we believe Defendant Hackett can be heard saying something like, "Everyone's going to be marching towards the Capitol."

---

[16] Mr. Minuta's sentencing memo acknowledges that Minuta made his own decision to enter the Capitol " Roberto had good intensions when entering the [Capitol] right behind the line of USCP led by Lt. Tarik Johnson who had gone inside to attempt to escort out USCP Officers he thought were trapped inside by the rioters." (Doc.569, p. 29)

> At around 23 seconds in, someone says something to the effect of, "Are we marching towards the Capitol after this?" and it seems as though it's Defendant James who responds, "Nobody knows." According to the metadata on the phone, both of these videos were filmed at 11:35 a.m. on January 6, 2021.

After that video was shot, James and his fellow security detail team members ultimately returned to the Mayflower hotel, where they remained until Michael Greene called James and instructed him to get to the Capitol.

### C. QRF

James drove from Alabama to Washington, D.C., accompanied by Grods and Ulrich. James brought his personal sidearm, but did not bring a rifle or long gun of any kind. Grods brought a handgun and a shotgun (Case No. 1:21-cr-437, Doc. 8). Ulrich did not bring any firearms. (Doc. 908, p. 7). None of their weapons were delivered to the QRF at the Comfort Inn in Balston; nor did James ever go there. Instead, James brought the weapons to his hotel room in Vienna. Unlike the Balston Comfort Inn, which is a quick drive away from Washington, D.C., James's hotel room was significantly farther away. And, on January 6, James's handgun and Grods's firearms sat in James and Minuta's unoccupied hotel room (not the QRF) until James returned that night and later drove home.

### D. Outburst in the Capitol

Mr. James acknowledged in his statement of offense that he had a physical encounter with police inside the Capitol. Mr. Minuta captured video of some of the encounter, and at least two officers were wearing body cameras that captured a portion of the encounter.

The encounter occurred just inside the  rotunda. Shortly beforehand, MPD officers had been tasked with the nearly impossible job of trying to clear the mob from the Rotunda.. It was pure chaos, there was very little room to move and police were having a difficult time.

When Joshua James stepped into the Rotunda, what caught his attention was an officer who appeared to be in distress. James explains: "[b]eing on the ground shoulder to shoulder, chest to chest with massive amounts of people. It was very hard to breathe. You couldn't hear. Everybody was screaming. I was paying attention somewhat to my surroundings, but at the same time having that tunnel vision of only focusing in directly within like 3-5 feet in front of [me]."[17] Speaking directly to the officer, James can be heard on video asking the officer "you want out?" His intonation, unlike the chants of others in the crowd, was not threatening or menacing, but questioning. Not receiving an audible verbal response, James asked again "you want out? You want out." As he stated this, he reached for the officer in an effort to pull him in the direction of the exit. James's motives in that moment have been questioned. The government has suggested it was not reasonable for James to believe that an officer would actually have wanted to exit the rotunda. But James wasn't the only one in the crowd to have such a belief.  Around this same time, a U.S. Capitol Police member was recruiting other protesters (not James) to help him get his fellow officers (some of whom were scared and overwhelmed) out of the building.[18]

Once James reached for the officer and attempted to pull him out, he was struck by police. In that moment, James lost all semblance of composure. His outburst in those moments was a situational byproduct of his severe, untreated PTSD and a constellation of related mental health symptoms. He began screaming and briefly grappled with police before another officer pepper-sprayed him and he left.  He did not physically injure any officer and he only remained inside the building for a total of roughly 13 minutes.

---

[17] James's Sentencing Mitigation Video.

[18] https://www.youtube.com/watch?v=k4EFWNROkak (around 2:25 minutes in).

Two months later, 33 year old James was arrested without incident on his way to work. He was among the first defendants to accept responsibility for his actions and he was the first defendant to plead guilty to seditious conspiracy.

### III. Seriousness of the Offense, Respect for the Law, Just Punishment and Adequate Deterrence

Mr. James's criminal conduct was, without question, serious. At the same time, he was the first of his co-conspirators to accept responsibility for this offense by pleading guilty to the charge of seditious conspiracy and cooperating with the government. His decision to do so made national headlines and paved the way for other guilty pleas. Such public acceptance of responsibility helps to promote respect for the law, as would a sentence that takes into account: i) the steps James has taken to cooperate with the investigation and make amends for his offenses; and ii) the significant collateral consequences that Mr. James has sustained as a result of his criminal convictions.

A. Cooperation

Mr. James's cooperation with the government in this case began long before he was offered a written plea agreement. In June of 2021, two months after this Court granted his pretrial release, Mr. James drove up from Alabama to meet with the government, accompanied by his defense counsel, for the first of many proffer sessions with the government. Over the course of the next two plus years, his cooperation continued. It consisted of: i) numerous debrief meetings; ii) grand jury testimony; iii) trial testimony preparation; and iv) the surrender of physical evidence (firearms, ammunition and other tactical gear purchased by Mr. Rhodes) to be used as trial exhibits. He also provided the government with access to the Alabama storage unit

that he rented for storing Mr. Rhodes's gear and receipts to show he rented the unit shortly after he returned home from his trip to Texas.

In his debriefs and grand jury testimony, Mr. James provided pivotal information on the Oathkeeper organization, its hierarchy, members and activities. James also provided previously unknown details regarding post-Jan 6 activities committed by Mr. Rhodes, other co-conspirators, and Mr. James himself. Ironically, much of this information was later used by the government in the indictment and plea agreement against Mr. James himself.

When Mr. James began his cooperation in June, 2021, the hope and expectation among the parties was to reach a plea agreement to some number of felonies based on his charges in the 4th and 5th superseding indictment (i.e. obstruction of an official proceeding, conspiracy to obstruct an official proceeding, etc.) and avoid future charging documents containing more serious charges (i.e. seditious conspiracy). That expectation was unexpectedly dashed for Mr. James and the defense team when the formal plea offer was extended, which called for James to also plead guilty to the as yet unindexed charge of seditious conspiracy. Despite the considerable cost to himself and his family — including the loss of his lifetime military monthly disability retirement,[19] medical insurance for himself, his wife and children, and loss of other benefits (including his homeowner's insurance and banking institution)— Mr. James chose to

---

[19] *See* Exhibit 6 (notice of retirement and benefit revocation).

waive his right to trial and become the first criminal defendant in over 60 years to enter a pretrial cooperation plea agreement with the United States Government to seditious conspiracy.[20]

On March 2, 2022, Mr. James publicly entered his cooperation plea agreement that directly implicated Mr. Rhodes and other co-conspirators awaiting trial. He did so despite mounting pressure from from the far-right media and despite gaslighting from Mr. Rhodes himself. Just days prior to James's guilty plea, Mr. Rhodes did a jailhouse interview, which was live-streamed on social media, where he condemned January 6 defendants' decisions to plead guilty.

Mr. James's cooperation agreement was reported in the media as "the first of its kind for a Jan. 6 defendant." It, predictably, made national headlines and changed the public narrative from one focused on the historic difficulties of securing a conviction for seditious conspiracy to one focused on the historic nature of the Department of Justice securing the first Jan. 6 related seditious conspiracy conviction.

Nearly two months after Mr. James entered his guilty plea, co-conspirator Bryan Ulrich, who was directly implicated in James' Statement of Offense, followed suit. Days later, another Oathkeeper (Todd Wilson) plead guilty too. Finally, although James was ultimately not called to testify at trial, he was prepared and willing to do so. He was placed "on call" in the event the government needed to call him in its case-in-chief or in rebuttal.

---

[20] In or around 1955, four of seventeen criminal defendants cooperated and plead guilty to seditious conspiracy in connection with a conspiracy by the Nationalist Party of Puerto Rico involving a series of armed revolts culminating in an attack at the U.S. Capitol where, from the gallery of the House of Representatives, the cooperator's co-conspirators fired guns at assembled Congressman, wounding five. All four defendants who pleaded guilty received suspended sentences. *See United States v. Lebron*, 222 F.2d 531, 532 (1955).

Mr. James has no doubt that his decision to accept responsibility and enter into a cooperation agreement with the government was unquestionably the right decision, but it came at considerable cost to him and his family. Mr. James and his wife, who have three children, received hate mail and threatening letters. Mrs. James even received a text threat on her phone about the likely revenge that prison inmates would one day inflict upon James due to his cooperation. On more than one occasion trespassers came unannounced to their doorstep, a fact all the more concerning to the James's because they live in a remote area and (per bond conditions) have no weapons in the home to defend themselves against intruders.

### B. Collateral Consequences

The need for further deterrence and protection of the public is lessened because Mr. James's conviction itself has already visited substantial punishment upon him. This Court can consider the collateral consequences of Mr. James's seditious conspiracy conviction as a relevant factor in determining the need for the sentence imposed to reflect just punishment and adequate deterrence. *See, e.g. United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming district court's finding that a lower sentence was warranted where defendant lost his teaching certificate and his state pension as a result of his conduct because "consideration of these facts is consistent with 3553(a)'s directed that the sentence reflects the need for just punishment and adequate deterrence."); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009), (need for further deterrence and protection of the public is lessened where the conviction itself already visits substantial punishment on the defendant); *United States v. Jaime*, 235 F. Supp. 3d 262, 265 (D.D.C. 2017) (Considering collateral consequences of a criminal conviction in exercising its discretion to sentence defendant to pre-judgment probation).

Part of Mr. James's punishment will be the repercussions of becoming a felon. The future restrictions on his liberties will serve as a severe punishment on its own. For the next three years, he will have to answer to a probation officer and will be restricted in his travel, his associations, and his freedom of movement. That alone is significant, but when combined with the past four years of pretrial supervision (during which he served two months on home incarceration,[21] another three months on home detention,[22] and another 17 months on curfew with location monitoring[23]), amounts to a total of seven years of supervision. Additionally, he spent thirty days in jail before he was granted release.

Far more devastating than the collateral consequences of being a felon are the consequences he will continue to suffer for the remainder of his lifetime in light of his conviction for seditious conspiracy. Under Title 38 of the U.S. Code, § 6105, veterans convicted of 'subversive activities' forfeit their benefits to health care, disability compensation, education and burial benefits, plus pensions. Their dependents also lose benefits.

After the entry of his guilty plea, Mr. James received notice from the Department of Veterans Affairs (V.A.) terminating his monthly disability retirement payments[24] and all other V.A. benefits effective January 5, 2021. Before losing his benefits, Mr. James received approximately $3,425 per month ($41,100 annually) in disability retirement payments—

---

[21] *See* Case No. 1:21-cr-28 (Doc. 158).

[22] *See* Case No. 1:21-cr-28 (June 1, 2021 Minute Order).

[23] See Case No. 1:21-cr-28 (August 30, 2021 Minute Order).

[24] Prior to losing his benefits, Mr. James received approximately $3425 per month ($41,100 annually) in disability benefit pay. Over the span of his lifetime, assuming he lives to the average age of 75, that translates into a fine of $1,726,200.

compensation earned not merely for the noble decision to enlist in the United States Army, but for sustaining a life-threatening combat injury that left him with a 100% service connected disability. He has now lost that. Over his lifetime, assuming an average lifespan of 75 years, this amounts to a total loss of $1,726,200. And, because the V.A. made his termination of benefits retroactive, he now owes the Department of Veterans Affairs $98,371.83.[25]  In sum, Joshua James has endured significant punishment that will impact him and his family[26] for the rest of his life.

A sentence of no more than three months will  promote respect for the law given that Mr. James, who has no prior criminal convictions, has already pleaded guilty, publicly acknowledged his behavior and cooperated with the investigation, has spent time in jail, has spent four years under strict pretrial release supervision, and has suffered catastrophic financial consequences. This

### IV) Need to Protect the Public From Further Crimes

When considering the appropriate disposition, consideration should be given to data from the Administrative Office of Courts which establishes that it will cost taxpayers "roughly eight times" the amount of placing Mr. James on Probation to house in "in a Bureau of Prison institution or federal residential reentry center."[27] Further, in the nearly four years since Mr.

_____

[25] *See* Exhibit 6 (V.A. Collection Letter*).*

[26] Earlier this year, Mr. James six year-old son required surgery. The loss of V.A. healthcare caused the James to have to pay thousands of dollars out-of-pocket for the surgery.

[27] United States Courts, *Incarceration Costs Significantly More than Supervision,* published Aug. 17, 2017 (calculating average annual cost of imprisonment to be $34,770, residential reentry to be $29,290, and community supervision to be $4,392) (available at: https://www.uscourts.gov/news/2017/08/17/incarceration-costs-significantly-more-supervision).

James was arrested and released, he been has remained arrest free and largely compliant with his conditions of supervision. Notably, Mr. James's release conditions were far stricter than many of his codefendants. (*See* discussion, in III (B) *supra*)

### V. Need to Avoid Unwarranted Sentencing Disparities

A sentence of no more than three months incarceration avoids unwarranted disparities between Mr. James and the other cooperating defendants, none of whom have been sentenced to active jail time. The most comparably situated cooperating defendant is Brian Ulrich, who plead guilty to seditious conspiracy and obstruction of an official proceeding. He received a sentence of six months home confinement and three years of supervised probation. The remaining cooperating defendants have each been sentenced to terms of probation.

The defense recommendation appropriately takes into account Mr. James's enhanced culpability as compared to Mr. Ulrich, although there can be no question that the only true "leader" of this conspiracy was Stuart Rhodes. The recommendation also takes into account that Mr. James has been penalized in significant ways that Mr. Ulrich was not (i.e. loss of disability, health insurance and other military benefits. Further, unlike Mr. James, Mr. Ulrich did not serve 30 days in jail prior to his pretrial release and he was never placed on home incarceration, home detention, or curfew location monitoring.).

Although Mr. Ulrich's cooperation included trial testimony, Mr. James testified before the grand jury and was prepared to testify at trial had the government needed his testimony. Moreover, Ulrich's decision to enter a cooperation plea came about only after Mr. James entered his guilty plea, which inculpated Ulrich. James was the first defendant to enter a guilty plea to seditious conspiracy.

### VI. Need to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

This Court is charged with considering the medical, vocational, educational and other treatment needs of the defendant before issuing its sentence. The Supreme Court has reiterated that: "[18 U.S.C. § 3582(a)] prevents a sentencing court from imposing or lengthening a prison term because the court thinks an offender will benefit from a prison treatment program." *Tapia v. United States*, 564 U.S. 319, 334 (2011). In other words, incarceration in the BOP neither achieves nor is a substitute for the rehabilitative goal set forth in § 3553(a)(2)(D) of providing defendants with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner". This is especially true now, given the unprecedented and well documented staffing shortages that BOP is currently experiencing.

A. Documented BOP Staffing Shortage

On July 23, 2024, BOP Director Colette Peters testified about BOP's staffing crisis at a hearing entitled "Oversight of the Federal Bureau of Prisons" before a House Judiciary Subcommittee. She stated that BOP estimates it needs 3,000 additional correctional officers (a 21% increase from its current corps of 14,900) and about 3,000 additional medical positions (a 72% increase from the current level of 3,600). *See* Pavlo, Walter, Bureau of Prisons Director Testifies at House Judiciary Committee testimony," *Forbes*, July 27, 2024 (last accessed Dec. 2, 2024). The Director also acknowledged that the BOP's:

> Under-staffed institutions struggle to maintain safe and secure environments. FBOP is forced to overuse augmentation (reassigning employees to other under-staffed posts), mandatory overtime, and sometimes even locking down housing units to address staffing shortages. This results in adults in custody missing educational, programming, and work opportunities.

*See* BOP handout entitled "Facts About the FBOP's Staffing and Facilities Crisis" distributed by

Director Peters to members of the House Judiciary Subcommittee (last accessed Dec. 2, 2024).

Augmentation is a controversial stopgap measure that BOP has implemented to assist in

staffing shortages; whereby administrative and professional staff, including medical and

psychology personnel, are reassigned and required to vacate their own positions in order to to fill

vacant correction officer positions. *See* Pavlo, Walter, Bureau of Prisons Director Testifies at

House Judiciary Committee testimony*," Forbes*, July 27, 2024 (last accessed Dec. 2, 2024)*; see*

*also* Letter from Brandy Moore-White on behalf of the Council of Prison Locals to the President

of the United States, Joe Biden (last accessed Dec. 2, 2024) ("[staffing] shortages have resulted

in increased workloads, mandatory overtime, a practice called augmentation or reassignment

(where non-correctional officers are assigned to perform the duties of a correctional officer and

vacate their positions), and heightened stress levels for our staff, ultimately jeopardizing the

well-being of all involved.").

B. Staffing Shortages Have Lead to a Decline in Care for Inmates with Mental Health
Concerns

A recent report from the United States Department of Justice, Office of the Inspector

General (hereinafter "DOJ OIG") also cited chronic understaffing at BOP (especially in health

and psychology positions) and the use of "stopgap measures," such as mandated overtime and

temporary reassignment, as factors contributing to inmate deaths. *See* U.S. Dep't of Just., Office

of the Inspector General, Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of

Prisons Institutions pp. 64–69 (2024) (hereinafter "OIG Inmate Death Report"). In the report, the

DOJ OIG reviewed the deaths of 344 inmates from fiscal year 2014 to 2021. More than half the

deaths were suicides. The staffing issue was particularly striking with regard to suicides, as the report found that lack of staff in health and psychological services led to a decline in care for mentally ill inmates.

The OIG Inmate Death Report also determined that BOP had likely misclassified more than 2/3 of the suicidal inmates whose cases were examined by assigning them a lower mental health classification level ("MHCL") than was appropriate for the care they actually needed. *Id.* at 17. In at least two Psychological Reconstruction Reports, BOP concluded that the inmates' MHCLs were lowered in response to lack of staffing in the psychology services positions, rather than the inmates' actual mental health needs. *Id.* at 18. Staff training deficiencies were identified as another contributing problem.

> The 'absence of a critical mass of experienced staff deprives new staff of formal and informal mentoring, modeling and development that is critical to the safety, success, and sense of efficacy in a correctional career.' This absence of institutional knowledge 'places staff and inmates at increased risk of homicide, suicide, assault or escape.'

*Id.* at 14.

In addition to escalating the risk of harm for BOP inmates, "chronic overcrowding and understaffing impedes the delivery of recidivism-reducing programming and rehabilitative services such as job training, education courses, recreation, and [most importantly for Mr. James] counseling for mental illness and substance abuse." *See* Fed. Defenders' Comment on U.S. Sent. Commission's Proposed Priorities for 2024–2025 Amendment Cycle, at p.15 (May 15, 2024) (citing  Martin H. Pritikin, *Is Prison Increasing Crime?*, 2008 Wis. L. Rev. 1049, 1058; *Correctional Staffing Crisis*, 2024 Moore White Statement, at 3; *OIG Inmate Death Report*, at 64; *Correctional Staffing Crisis* (statement of Sen. Cory Booker, Chairman, Subcomm. on Crim. Just. and Counterterrorism) (discussing the correlation between lack of access to substance use

and mental health treatment in prisons and increased difficulties successfully reintegrated into society upon release).

Accordingly, while Mr. James is, without question, in need of continued mental health treatment for his severe PTSD and in need of substance abuse treatment for alcohol dependency, the "most effective manner" for him to obtain such treatment is not within the BOP. Critically, Dr. Guarnera endorses this point in her report when she states that "incarceration is highly likely to exacerbate Mr. James' already overwhelmingly severe [mental health] symptoms."[28] Instead, intensive Community treatment and alcohol monitoring with a multidisciplinary approach for "dual diagnosed" individuals with both substance use and mental health problem, as detailed by Dr. Lucy Guarnera in her Psychological Evaluation Report is the most, and arguably only, effective manner for Mr. James to receive the dual diagnosis treatment he needs. For these reasons and those stated below, Mr. James asks the Court to impose a sentence of no more than three months incarceration, followed by a term of supervised release.

## CONCLUSION

This Court has to consider all of the 18 USC §3553(a) factors when deciding what sentence to impose. The Court is well aware of its authority to fashion a sentence that is sufficient but not greater than necessary, taking into consideration the guidelines but not being beholden to them. I therefore respectfully recommend that the Court impose a sentence no

---

[28] Mr. James's mental health provider, Laura Hunter, also made this point in her letter to the Court: "He displays hyper-vigilant behaviors from PTSD, which would be exacerbated by incarceration circumstances. He is likely to have a worsening of symptoms." Exhibit 7 (letter from mental health provider).

greater than 3 months home incarceration, with credit for the 30 days he served in jail while

awaiting his detention hearing before this Court. *See* 18 U.S.C. § 3585(b).

Respectfully submitted,
Joshua James

By Counsel


_____/s/_____

Joan C. Robin
Virginia Bar No. 44502
Law Office of Joni C. Robin, PLLC
421 King Street, Suite 505
Alexandria, Virginia 22314
Ph: 703-349-1111
Fax: 571-279-6851
joni@jonirobinlaw.com


_____/s/_____

Christopher Leibig, Esq.
Virginia Bar No. 40594
Counsel for Defendant
421 King Street, Suite 505
Alexandria, Virginia 22314
(703) 683 4310
chris@chrisleibiglaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December, 2024, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this matter. I further certify on December 9, 2024, I emailed a copy of the foregoing to the United States Probation Officer assigned to this matter.


_____/s/_____
Joni Robin