**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-15-APM** |
| **JOSHUA JAMES,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR**
**DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joshua James to 24 months of incarceration, followed by three years of supervised release, during which time he must pay $2,000 in restitution and the mandatory $200 special assessment. Such a sentence would be sufficient to reflect the seriousness of this offense while also accounting for the defendant's acceptance of responsibility and substantial assistance to law enforcement pursuant to his public cooperation plea agreement.

I.    **INTRODUCTION**

On the afternoon of January 6, when it became clear that Congress was going forward with the certification of the 2020 presidential election, the defendant, Joshua James, joined the mob of rioters that breached the United States Capitol through the East Rotunda Capitol doors. The defendant's participation in the attack on the Capitol was not random; it was the culmination of months of following the increasingly violent calls by Elmer Stewart Rhodes III, a leader of a group called the Oath Keepers, to oppose the lawful transfer of power from then-President of the United

1

States Donald Trump to President-Elect Joseph Biden. James was privy to these communications because he was a Southeast regional leader of the Oath Keepers from Alabama, and he was in touch with Rhodes directly, prior to January 6. James admitted, through his guilty plea, that he entered the Capitol with the goal of disturbing the certification proceeding and that he participated in a conspiracy with Rhodes and others to oppose by force the lawful transfer of presidential power. For these reasons, he pled guilty to Seditious Conspiracy, in violation of 18 U.S.C. § 2384, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2).

Joshua James was one of the leaders in this conspiracy, akin to co-conspirators Kelly Meggs and Jessica Watkins whom this Court has already sentenced. Such conduct merits a significant sentence of incarceration. James, however, also deserves credit for his acceptance of responsibility and the substantial assistance he provided law enforcement, as detailed below. On balance, he should serve two years in prison for his role in this grave offense.

## II.    THE IMPACT OF *FISCHER*

Since James's guilty plea, in *United States v. Fischer*, the Supreme Court held that to prove a violation of 18 U.S.C. § 1512(c)(2) "the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or *attempted* to do so." 603 U.S. ----, 144 S. Ct. 2176 (June 28, 2024) (emphasis added). The parties agree that the facts admitted to by James in his statement of offense during his guilty plea are sufficient to establish an attempted violation of Section 1512(c)(2). Nonetheless, out of an abundance of caution, the parties have attached here an addendum to the Statement of Offense. The parties would ask that the Court place James under Oath at the start of the sentencing hearing to have him adopt the supplemental

statement of offense, to make sure he understands the elements of the offense of obstruction of an official proceeding, as clarified by the Supreme Court in *Fischer*, and to have the parties declare on the record their position that there is a sufficient factual basis to support James's guilty plea.

## III.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF 60, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

### B.    The Defendant's Role in the January 6, 2021 Attack on the Capitol

After the 2020 presidential election, James joined into a conspiracy with Rhodes and other members and affiliates of the Oath Keepers to oppose by force the lawful transfer of presidential power from Donald Trump to Joseph Biden. Indeed, in the weeks leading up to January 6, 2021, Rhodes instructed James and other co-conspirators in part to be prepared, if called upon, to report to the White House to secure the perimeter and use lethal force if necessary against anyone who tried to remove then-President Trump from the White House, including the National Guard or other government actors who might be sent to remove President Trump as a result of the Presidential Election. ECF 60 at ¶20.

In furtherance of this conspiracy, James and others gathered and stored multiple firearms on the outskirts of Washington, D.C.—some distributed across hotels and "quick reaction force" ("QRF") teams—and planned, if called upon, to use them in support of the plan to halt the lawful transfer of power. ECF 60 at ¶4. In January 2021, James and others traveled to D.C., and, on

January 6, equipped themselves with a variety of weapons, donned combat and tactical gear, and joined the attack on the Capitol with the goal of disrupting Congress' certification of the election. *Id.* James then destroyed evidence of his involvement in the attack and instructed others underneath him to do the same. *Id.* at ¶¶47-48.

Beginning in November 2020, Rhodes began disseminating messages on end-to-end encrypted meeting and messaging applications, including GoToMeeting and Signal, that encouraged other Oath Keepers members and affiliates to oppose by force the lawful transfer of presidential power. ECF 60 at ¶4. For example, on November 5, 2020—two days after the Presidential Election—Rhodes urged members of the "Leadership Intel Sharing Secured" chat ("Leadership Intel Chat"), to reject the presidential election result and stated, "We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit." On November 9, 2020, Rhodes held a private GoToMeeting titled, "Oath Keepers National Call - Members Only," which was attended by other co-conspirators. During the meeting, Rhodes outlined a plan to stop the lawful transfer of power, including preparations for the use of force, and urged those listening to participate: "You're from Oath Keepers. You got a responsibility and duty. You raised your freaking right hand. You swore that oath . . . you got to fight."

On November 14 and 15, 2020, James met with Rhodes, co-conspirator Thomas Caldwell, and others in the Washington, D.C. area and at Caldwell's Virginia farm where he learned about the start of some Oath Keepers' plans to oppose by force the lawful transfer of presidential power. ECF 60 at ¶5. Immediately, James began joining invitation-only encrypted Signal group chats with Rhodes and others—including the Leadership Intel Chat and the "Dec 12 DC Security/Leadership" chat. *Id.* at ¶6-7. On December 14, 2020, Rhodes posted in the Dec 12 Security/Leadership chat,

"It will be a bloody and desperate fight. We are going to have a fight. That can't be avoided." *Id.* at ¶8.

That same day, December 14, 2020—also the day that presidential electors from each state and the District of Columbia cast their votes in the Presidential Election—Rhodes published a letter on the Oath Keepers website advocating for the use of force to stop the lawful transfer of presidential power. He made similar posts that day to the Leadership Intel Chat. *Id.* at ¶9. On December 21, 2020, James messaged the Leadership Intel Chat, "SE Region creating a NATIONAL CALL TO ACTION FOR DC JAN 6TH.... 4 states are mobilizing." *Id.* at ¶10. When he did not receive an immediate response, James posted, "DID NO ONE HEAR ME!!!! 3 STATES ARE MOBILIZING TO DC!!! Everyone in this channel should understand the magnitude i just sent!!" *Id.*

On December 23, 2020, Rhodes published a second open letter on the Oath Keepers website. Referencing the Certification of the Electoral College Vote scheduled to occur on January 6, 2021, Rhodes explained that "tens of thousands of patriot Americans, both veterans and nonveterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C." Rhodes warned that he and others may have to "take to arms in defense of our God given liberty." *Id.* at ¶11.   The same day, James sent Rhodes's letter to co-conspirator Mark Grods and told him it was required reading.

Throughout December 2020 and January 2021, Rhodes, James, and others administered and participated in meetings on GoToMeeting and group chats on Signal. James and several others attended these invitation-only meetings organized to facilitate planning for the events of January 6, 2021, in and around Washington, D.C. *Id.* at ¶13. On December 30, 2020, for example, Rhodes

administered, and James and others joined, an invitation-only Signal group chat titled, "DC Op: Jan 6 21." *Id*. at ¶14. And, on December 31, 2020, Rhodes administered, and James and others joined, an invitation-only Signal group chat titled, "Jan 5/6 DC Op Intel team." *Id*. at ¶15.

From late December 2020 into January 2021, James and his co-conspirators continued to coordinate in advance of January 6, 2021, including regarding firearms and quick reaction forces. On December 31, 2020, one individual messaged James, "i have friends not far from DC with a lot of weapons and ammo if you get un trouble i ca Coordinate help." *Id*. at ¶16. James responded, "that might be helpful, but we have a shitload of QRF on standby with an arsenal." *Id*. The next day, on January 1, 2021, co-conspirator Brian Ulrich messaged James, "Hey we told to bring guns and maybe stage them in VA?? But you are showing hotels in DC for Alabama. Are we bring guns or no if so how will that work?" *Id*. at ¶17. James responded, "Were working on a Farm location Some are bringing long rifles some sidearms… I'm bringing sidearm." *Id*. On January 4, 2021, James traveled with Ulrich, Grods, and others to the Washington, D.C., metropolitan area. *Id*. at ¶18. James brought a semi-automatic handgun, and Grods and others brought firearms, including a rifle, a shotgun, a semi-automatic handgun, and ammunition. *Id*. James stored the Southeast Regional group's firearms at the Virginia hotel where he, Rhodes, co-conspirator Roberto Minuta, and others had rooms. *Id*. On the morning of January 6, 2021, at approximately 6:27 a.m., Rhodes confirmed to the members of the DC OP: Jan 6 21 Signal group chat, "We will have several well equipped QRFs outside DC. And there are many, many others, from other groups, who will be watching and waiting on the outside m case of worst case scenarios."

Shortly after 1:30 p.m. on January 6, as rioters began to breach the Capitol building, Rhodes posted to the DC OP: Jan 6 21 Signal group chat: "Pence is doing nothing. As I predicted." Rhodes

added, "All I see Trump doing is complaining. I see no intent by him to do anythmg. So the patriots are taking it into their own hands. They've had enough." Shortly before 2:00 p.m., a participant in the Jan 5/6 DC Op Intel team Signal chat posted a video titled, "live stream of patriots sotrming capital." *Id*. at ¶27. Another participant asked, "Are they actually Patriots – not those who were going to go in disguise as Patriots and cause trouble[?]" *Id*. Rhodes answered, "Actual Patriots[.] Like the Sons of Liberty were pissed off patriots." *Id*. James followed with, "Were coming to capitol ETA 30 MIN." *Id*.

James then led his Southeast group to the Capitol while coordinating with leadership. Between 2:00 p.m. and 4:05 p.m., James exchanged multiple phone calls with the operation leader Rhodes had appointed for January 6, co-conspirator Michael Greene. *Id*. at ¶28. At around 2:30 p.m., James, Minuta, Grods, and others departed their hotel in combat and tactical gear and Oath Keepers patches and traveled to the Capitol on golf carts, driving around multiple barricades, including marked law enforcement vehicles. *Id*. at ¶29. As the group sped around police barricades on a golf cart, Minuta—seated next to James, who was driving—stated in a video he "livestream" posted to Facebook that the group was "headed to the Capitol" because "patriots storm[ed] the Capitol building." Gov. Exh. 1508. Minuta described the situation as "f***ing war in the streets right now." *Id.* As the group parked their golf carts just outside the entrance to the Capitol grounds, Minuta stated, "Word is that they got in the building. Let's go." As the group marched onto the Capitol grounds, onlookers shouted, "Good job guys" and "Go fight some Congressmen," and Minuta responded, "Thank you." *Id.*

Upon arrival at the Capitol, James marched through crowds of rioters with his group in a military "stack" formation with hands on shoulders and gear. *Id*. at ¶30. The group maneuvered

their way through the throngs from the west side to the east side of the Capitol. *Id.* At about 3:15 p.m., the group, led by James and Minuta, breached the Capitol through the East Rotunda doors in part to hinder or delay the certification of President-Elect Joseph R. Biden as President of the United States. *Id.* at ¶32.

After breaching the Capitol, as recorded in videos the government will present to the Court at sentencing, James led Minuta deeper into the building where he assaulted law enforcement. At 3:16 p.m., now inside the Capitol lobby outside the Rotunda, James asked Minuta, "Want to keep pushing in?" *Id.* at ¶33. Minuta responded, "yup." James then pushed toward the Rotunda, yelling, "Keep fucking going." *Id.* At 3:17 p.m., upon reaching the Rotunda, James and Minuta joined alongside others in a mob confronting and physically engaging with a line of law enforcement officers who formed a barrier between the lobby and the Rotunda. *Id.* at ¶34. Minuta, standing behind James and recording the events with a camera, began yelling, "This is what's bound to happen, just get out! Get out! Get these cops out! It's our fucking building! Get 'em out, get out!" *Id.* James approached one of the Metropolitan Police Department officers, Officer Jose Mendoza, and repeatedly told him to "chill" and yelled at the officer. *Id.* James then yelled, "Do you want out? Do you want out? Do you want out?" *Id.* When the officer engaged with James to remove him and the rioters from the building, James assaulted the officer by grabbing his vest and pulling him toward the mob. *Id.* Other officers behind this victim grabbed the victim's vest and pulled him back into the line of officers. While pulling the victim officer, James yelled, "Get out of my Capitol! Get out! Get out of my Capitol!" *Id.* James fell backward and then jumped and pushed toward the officers repeatedly, continuing to yell, "This is my fucking building! This is not yours! This is my Capitol!" *Id.* As Officer Mendoza's body-worn camera showed in a related trial, he

repeatedly pleaded for James and the others to leave, panting, "I can't breathe."

James and Minuta did not leave. Minuta and other members of the mob then began pushing James forward into the Rotunda while James yelled, "Keep going!" *Id*. at ¶35. James and Minuta breached the Capitol Rotunda, and then James was expelled by at least one officer who aimed chemical spray directly at James. *Id*. Multiple officers then forcibly pushed James out of the Rotunda from behind. *Id*. Eventually, James and Minuta exited the Capitol and gathered with Rhodes and several co-conspirators approximately 100 feet from the northeast corner of the Capitol. *Id*. at ¶38. There, Rhodes told James he was glad James and other had gone inside the building. *Id*.

Later that night at 7:30 p.m., Rhodes messaged the DC OP: Jan 6 21 Signal chat, "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming." *Id*. at ¶42. At Rhodes's instruction, James and other co-conspirators met with Rhodes later that evening at a restaurant in Vienna, Virginia. *Id*. at ¶43. Rhodes talked with James and the group about saving "the Republic" by stopping the transfer of presidential power and began to make plans to oppose the Inauguration on January 20, 2021, including by having people open-carry firearms at state capitols around the country. *Id*. While at the restaurant, James, Rhodes, and others came to believe that law enforcement was searching for Rhodes and others in connection with the events earlier that day at the Capitol. *Id.* at ¶44. The group immediately returned to their hotel, collected their belongings, and met at a nearby gas station. *Id*. There, James saw what he estimated to be thousands of dollars' worth of firearms, ammunition, and related equipment in Rhodes's vehicle. *Id*. Rhodes divvied up various firearms and other gear among James and others who occupied a total of three cars. *Id*. Rhodes left his mobile phone with one person and departed

with another person in their car so that law enforcemenr could not locate and arrest him. *Id*. The three cars then departed in separate directions, and James returned to Alabama with some of Rhodes's gear, including firearms and other tactical equipment. *Id*.

On January 8, 2021, James met with Rhodes and another defendant, Kellye SoRelle, at a restaurant in Alabama. *Id*. at ¶46. There, James showed Rhodes a video of James's physical altercation with law enforcement officers inside the Capitol on January 6, 2021, that Minuta had recorded from behind. *Id*. Rhodes expressed gratitude for James's actions and told James to alter his physical appearance to conceal his identity. *Id*.

On January 8, 2021, James received a Signal message, in a group chat that included Rhodes, from SoRelle—an individual he understood to be an attorney for the Oath Keeper—that stated, "STEWART: YOU ALL NEED TO DELETE ANY OF YOUR COMMENTS REGARDING WHO DID WHAT. You are under zero obligation to leave them up. You/we have not yet gotten a preservation order instructing us to retain those chat comments. So DELETE THEM. I can't delete them because this is a legacy Signal chat that doesn't let me delete comments. Only the comment author can delete a comment. So GET BUSY. DELETE your self-incriminating comments or those that can incriminate others. Start now." *Id*. at ¶47. After receiving this message, James forwarded it to Grods and instructed him to "make sure that all signal comms about the op has been deleted and burned." *Id*. at ¶48. James also messaged Ulrich on Signal and instructed him to delete messages with photographs that included their faces. *Id*.

That same day, January 8, 2021, James collected all of his firearms and Grods's shotgun and traveled to Texas to stay with Rhodes and others, in part, to serve as Rhodes's security and to be prepared to carry out Rhodes's next instructions. *Id*. at ¶49. James remained in Texas with

Rhodes until February 2021. Prior to the Inauguration on January 20, 2021, James, Rhodes, and other co-conspirators had a number of interactions: *First*, Rhodes gave James a burner phone and instructed james to manufacture a false identity for the phone, including a false name and address. *Id*. at ¶50(a). James subsequently wrote the false name and address—John Smith, 201 Oak Street, Albie, NE 68001—along with a phone number and Signal pin number on a sticky note placed inside the back of the phone's battery case. *Id*. Rhodes did not allow James and others to have their mobile phones powered on or nearby any time they discussed the Presidential Election and next steps. *Id*. *Second*, James accompanied Rhodes on multiple trips where Rhodes purchased thousands of dollars' worth of firearms and tactical equipment, including scopes, ammunition, magazines, biopods, duffel bags, holsters, and firearm-maintenance equipment. *Id*. at ¶50(b). According to James in multiple government proffers, Rhodes purchased quantities and firearms and tactical equipment that made even the store clerks look worried and concerned. *Third*, James messaged with co-conspirator Kelly Meggs and Ulrich about next steps. *Id*. at ¶50(d). Ulrich messaged James that he and Rhodes needed to "stay below the radar." *Id*. James also inquired whether Kelly Meggs would travel to Texas with others to help execute Rhodes's next steps. *Id*. Meggs responded, "Nope Fl stays home until shots fired!" *Id*. *Fourth*, Rhodes, while in a vehicle with James in Texas, gave James an AR-platform firearm and explained that Rhodes would not be taken by law enforcement without a fight. James understood Rhodes to be ordering him to help defend Rhodes against law enforcement with force in the event of an arrest. *Id*. at ¶50(c).

James departed Texas in February 2021. *Id*. at ¶51. At Rhodes's instruction, James took with him multiple firearms, thousands of rounds of ammunition, multiple burner phones, scopes, magazines, night-vision equipment, and other tactical gear. *Id*. Rhodes told James to be prepared

to transport and distribute the equipment to others upon Rhodes's instruction and to be prepared for violence in the event of a civil war. *Id*. James stored this equipment in a storage shed in Alabama and awaited Rhodes's instructions. *Id*.

## IV.    THE CHARGES AND PLEA AGREEMENT

On March 2, 2022, James pled guilty to Counts One and Three of the Indictment in this case, charging him with one count of Seditious Conspiracy, in violation of 18 U.S.C. § 2384 (Count One), and Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Three).

## V.    STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, James faces up to 20 years of imprisonment on each count of conviction, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $200 for this offense.

## VI.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).

12

### A.  Total Offense Level Calculation

The plea agreement calculated James's total offense level as 29, resulting in a Guidelines range of 87 to 108 months' imprisonment. However, between the time of the guilty plea and the filing of this sentencing memorandum, the D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). *Brock* held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id*. at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice," does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes.

### a.  Base Offense Level and Grouping

For the reasons articulated in the PSR, the same Guidelines apply to both Counts One and Three. There is no guideline provision expressly promulgated for seditious conspiracy. Under U.S.S.G. 2X5.1, where available, the Court should apply the most analogous offense guideline. The most analogous offense to seditious conspiracy is Treason, under U.S.S.G. 2M1.1. For this particular defendant, in this particular case, U.S.S.G. 2Ml.l(a)(2) applies, which further directs the Court to select the base offense level applicable to the most analogous offense applied to the defendant's specific conduct. In this case, "Obstruction of Justice" under U.S.S.G. 2J1.2 is the most

analogous offense for this defendant's specific conduct. This puts the base level for both counts at 14.

Counts One and Three are grouped together into a single group under U.S.S.G. 3D1.2(c). Because Count One, Seditious Conspiracy, and Count Three, Obstruction of an Official Proceeding, have the same offense level as calculated above for this particular defendant, that offense level constitutes the combined offense level for both counts.

b.  Extensive Scope, Planning, and Preparation

The parties agreed under the terms of the plea agreement, ECF 59 at 3, that James's offense involved extensive scope, planning, and preparation, under U.S.S.G. § 2J1.2(b)(3)(C). As this Court found at the sentencing hearings for James's co-conspirators in *United States v. Rhodes, et al.*, No. 22-cr-15, and *United States v. Parker*, et al., No. 21-cr-28:

> Clearly there was extensive scope and planning for the events of January 6th. Even if we take the time period simply from December 19th forward, there's extensive scope and planning in terms of gathering people, making arrangements for transportation, hotel, bringing of weapons, and creating of groups to operate on that day. And then, of course, planning and preparation in terms of going into the building was exhibited by the way in which people entered in groups—that is planning and preparation, and shows organization.

5/25/23AM Tr. at 76. Indeed, the facts admitted by James in the statement of offense he adopted as part of his plea, as well the evidence introduced in the related *Rhodes* and *Parker* trials, established that James participated in a conspiracy that was extensive in both its objective and size. A total of 25 individuals have been convicted for their roles in this conspiracy: seven defendants from the *Parker/Crowl* case, nine defendants in *Rhodes*, co-conspirators Jonathan Walden and Kellye SoRelle, who recently pled guilty, and seven of the cooperating co-conspirators. The conspiracy and its attendant conduct was protracted, lasting from December 2020 through January

14

2021. The members of the conspiracy, including James, communicated with each other using sophisticated encrypted messaging applications, email servers, and meeting platforms. They also coordinated with one another to travel across the country from Arizona, Texas, Alabama, Georgia, Florida, Ohio, Indiana, North Carolina, Virginia, and elsewhere into the D.C. area. The presence of the armed QRF staged miles from the Capitol building at a hotel in Virginia, armed with firearms and other weapons collected from numerous persons, also shows the extensive scope of the offense. Finally, the scope of the conspiracy's objective was itself enormous: to forcibly prevent an entire branch of the federal government from performing its constitutional and statutory duties.

c. Obstruction/Destruction of Evidence

The PSR and parties correctly determined that this Court should apply Section 3C1.1's two-level enhancement for obstruction of justice. This enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. The commentary to the Guidelines includes a non-exhaustive list of some of the ways that a defendant can obstruct justice, including by deleting evidence or instructing others to do so, or attempting to do so. U.S.S.G. § 3C1.1, cmt. n. 4(D). Here, James admitted through his guilty plea that he instructed other co-conspirators to delete and burn Signal messages that could be incriminating after forwarding SoRelle's message to do so.

d. Aggravating Role

The PSR and parties also correctly determined that this Court should apply Section

3B1.1(b)'s three-level enhancement for James's aggravating role in the conspiracy. The Guidelines provide for an increase in the offense level if the defendant played an aggravated role in the offense, as an "organizer" or "leader" (four levels) or "manager" or "supervisor" (three levels) of a criminal activity that involved five or more participants. U.S.S.G. § 3B1.1(a), (b). The Court should consider the following non-exhaustive factors in determining whether to apply the adjustment and, if so, whether to add three or four levels:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting U.S.S.G. § 3B1.1, cmt. n.4). "No single factor is dispositive." *Id.* The aggravating-role adjustment applies to a defendant who "managed" or "supervised" merely one other person, so long as the larger criminal activity that constituted the "relevant conduct" involved five or more participants. U.S.S.G. § 3B1.1(a), cmt. n.2. The three-point enhancement in Section 3B1.1(b) is a "middle-rung enhancement." *United States v. Otunyo*, 63 F.4th 948, 958 (D.C. Cir. 2023). Importantly, the Circuit recently reiterated that this Chapter 3 role adjustment is determined by looking broadly at all relevant conduct rather than simply the offense of conviction. *Otunyo*, 63 F.4th at 958-59.; *see also United States v. Olibrices*, 979 F.2d 1557, 1560–61 (D.C. Cir. 1992) (holding that a sentencing judge should "take into account the contours of the entire conspiracy," rather than merely the offense of conviction, when determining whether a Chapter Three adjustment applies to a defendant's role in the criminal activity). In other words, a defendant should receive the adjustment even if he is not at the top of the hierarchy, so long as he played a managerial or supervisory role anywhere within the criminal

activity.

As this Court found at the sentencing hearings for some of James's co-conspirators in *United States v. Rhodes, et al.*, No. 22-cr-15, this case presented a hierarchical structure of culpability, leadership, and management. The Court previously applied the three-level enhancement for co-conspirator Jessica Watkins (who managed the smaller Ohio contingent of Oath Keepers) and reserved the four-level enhancement for co-conspirators Stewart Rhodes and Kelly Meggs (both of whom led and organized larger groups of the Oath Keepers before and on January 6, 2021). As James agreed in his plea agreement, he qualifies for the three-level managerial enhancement. As the facts above and presented at other, related trials illustrate, James led the Southeast contingent of Oath Keepers—including Mark Grods, Brian Ulrich, Jonathan Walden, and others—throughout the preparation phase of the operation and on the day of January 6. He organized the group, administered secure meetings and chats, provided transportation from Alabama, organized the firearms plans for the group, and literally drove them from the hotel to the Capitol, leading their stack into the building. Throughout his role in the conspiracy, James took instructions and guidance from leaders like Rhodes, and managed downward for his group. Rhodes introduced James as a leader to the wider conspiracy, and James filled that role.

e. <u>Acceptance of Responsibility</u>

With respect to applicable downward adjustments to James's Sentencing Guidelines range, a 2-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1, because the defendant has clearly demonstrated his acceptance of responsibility, and an additional 1-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1(b), because the defendant has assisted authorities by providing timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid

preparing for trial and permitting the Court to allocate its resources efficiently.

      f.   "Zero-Point" Offender

The Court should not, however, apply U.S.S.G. § 4C1.1, the so-called "zero-point-offender downward adjustment" to this case. Recent amendments to the Sentencing Guidelines for 2023 added § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Under Section 4C1.1(a)(3), however, the adjustment should not be applied to defendants who use violence or credible threats of violence in connection with their offense. "In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction." *United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

Here, James's presence and conduct in part caused the continued interruption to Congressional proceedings; thus, the court should find that the defendant in fact impeded or disrupted the orderly conduct of Government business or official functions. James not only joined the mob that forced entry into the Capitol, and thus participated in violence that should disqualify him from this adjustment, but also he was responsible for assaulting officers in the Rotunda as part

of that violent mob. He also participated in a seditious conspiracy to oppose by force the lawful transfer of presidential power and brought his own firearms and ammunition to the D.C. area in support of this conspiracy. Due to the unique nature of the January 6 mob, the harms caused and posed by the seditious conspiracy James joined with Rhodes and others, and the significant need to deter future conspiracies from using force to seek to alter the results of elections, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, and the seditious conspiracy in which James participated, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.[1]

To avoid unnecessary litigation, if the court declines to apply Section 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

### g. Total Offense Level Before Departures

For the forgoing reasons, the Sentencing Guidelines' total offense level before departures is as follows:

---

[1] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

<u>Count One and Count Three: 18 U.S.C. §§ 2384, 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. § 3B1.1(b) | Aggravating Role | +3 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | <u>-3</u> |
| | **Total** | **18** |

In sum, based on this Sentencing Guidelines analysis, the defendant is at level 18 prior to any upward or downward departures.

**B. Upward Departures**

a. <u>Terrorism</u>

As in the *Rhodes* and *Parker* sentencings, the Court should apply an upward adjustment because James committed offenses that were calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct. James was an active participant in the Oath Keepers' conspiracy to forcibly oppose the lawful transfer of power from then-President Donald Trump to President-Elect Joseph Biden.

Note 4 to Section 3A1.4 provides that an upward departure is "warranted" if the defendant's "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4(A). When it adopted Note 4, the Sentencing Commission explained that it is "an *encouraged, structured upward departure,*" the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied." Sentencing Guidelines, App. C, amend. 637 (2002) (emphasis added).

20

James's conduct was clearly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4., cmt. n.4. A defendant's offense is so "calculated" if that offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See, e.g., United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012). As this Court observed in sentencing the defendants in the related *Rhodes* matter, "[I]t is challenging to find that in a case where individuals were convicted of participating in a [] conspiracy to stop the lawful transfer of power after a United States Presidential election, that they plotted to use force in so doing—it is very hard to not see that as terrorism within the definition certainly at least Note 4. That is certainly conduct that is calculated or intended to result in the coercion and intimidation of the government in order to achieve some purpose." 5/25/23AM Tr. at 36.

So too, with Joshua James. On January 6, he breached the Capitol as part of a conspiracy to use force to stop the lawful transfer of presidential power. Prior to and on January 6, he made statements and took actions that showed the object of this force was to influence or affect the conduct of the government by intimidation or coercion, and to retaliate against government conduct. He admitted, through his guilty plea, that he entered the Capitol with the goal of disturbing the certification proceeding. ECF 4 at ¶33. Thus, like his co-conspirators in the *Rhodes* matter, James's conduct was calculated to influence or affect the actions of government through intimidation and coercion, and to retaliate against government conduct and thus, the Court should apply an upward departure under Note 4. Yet, *unlike* certain co-conspirators this Court has already sentenced with an upward departure of one level—including Brian Ulrich—Joshua James was a leader in this conspiracy and acted more significantly to influence government action through

terror, including both in corralling others to join and his own conduct in the Capitol itself. In that way, James is more similarly situated to co-conspirators Kelly Meggs and Jessica Watkins, whom this Court sentenced with an upward departure of three levels each. Accordingly, applying the same framework the Court used for determining the appropriate sentencing ranges for the other co-conspirators, and considering James's cooperation, the governments seeks an upward departure of two levels for James.

      b.  <u>Additional Upward Departures</u>

Additionally, as this Court has observed in a related case, "§ 2J1.2 does not adequately account for the seriousness of convictions for seditious conspiracy" and related offenses, and it also "does not account for an unprecedented day like January 6." No. 22-cr-15, ECF No. 877. Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," and suggests that "if any such circumstance is present in the case and has not adequately been taken into consideration in determining the applicable guideline range, a departure consistent with 18 U.S.C. § 3553(b) and the provisions of this subpart *may* be warranted." U.S.S.G. § 5K2.0(a)(2)(A). There are at least two such identified circumstances present here: disruption of a governmental function (Section 5K2.7), and the use or possession of weapons in the commission of the offenses (Section 5K2.6). The Court is not required, however, to depart upwards because of the presence of these factors. Rather, "Departures permit courts to impose an appropriate sentence in the exceptional case in which mechanical application of the guidelines would fail to achieve the statutory purposes and goals of sentencing." U.S.S.G. § 5K2.0, cmt. 5. For the reasons set forth in the application of the Section 3553(a) factors below, this case does not require these upward

departures because, notwithstanding the grave nature of the offenses at issue here, the statutory purposes and goals of sentencing can be achieved in this case without applying them.

### C. Downward Departure

The government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure for the substantial assistance James has provided to law enforcement. The Guidelines provide that, "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. In determining the appropriate level of reduction to apply, the Court should consider the following factors:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

Here, the fourth and fifth factors clearly apply and can be quickly addressed. James was cooperative early on, meeting with the government for the first time within three months of being arrested in March 2021. From then on, James met with the government dozens of times—in Washington, D.C. and in Alabama, on virtual calls and in person. Indeed, James was in the course of meeting with the government when the government eventually became prepared to indict a

subset of defendants—including James—with seditious conspiracy in January 2022, and yet he *continued* to meet and provide information afterward. When the government was prepared to enter into a plea agreement, James accepted and pled guilty to certain counts in an indictment that charged him with some of the most serious offenses relating to the January 6 attack on the Capitol. And he did so in March 2022—approximately seven months before the first trial in any of the Oath Keepers-related cases. Thus, James's cooperation has been extremely timely. U.S.S.G. § 5K1.1(a)(5).

This cooperation was not without risks. To plead guilty pursuant to a public cooperation plea agreement in a case that has garnered such national interest and, sadly, controversy, took courage on James's part. In fact, James, his spouse, and his family dealt with certain threatening conduct on their devices and on or around his property after his plea agreement, terrifying his family and prompting him and his counsel to contact the government and federal law enforcement. His experience is similar to that of other individuals who cooperated publicly with the government in this investigation who have received such threats. Thus, this court should give James credit for the danger and risk of injury to himself and to his family that resulted from his entry into a public cooperation plea agreement in this case. U.S.S.G. § 5K1.1(a)(4). It is also worth noting that James pled guilty to the specific charge of seditious conspiracy, and he was the *first* to do so in all of the January 6 cases. This decision was significant for the wider Department's investigation into the events of January 6 and this particular conspiracy investigation. And James took this step despite knowing that it would result in the garnishment of past payments dating from January 6, 2021 on and the immediate and permanent termination of his significant military disability and retirement benefits moving forward—amounting to large sums of money over his lifetime that he and his

family will never receive. Finally, after James's plea, two additional co-conspirators followed suit and pled guilty to seditious conspiracy, including Brian Ulrich and William Todd Wilson.

With respect to the significance and usefulness of the defendant's assistance (the first and third factors), the defendant provided information about the leader and other members and affiliates of the Oath Keepers who conspired to participate in the attack on the Capitol and interfere with the lawful transfer of power on January 6. By their nature, criminal conspiracies are challenging to prove without information from individuals on the inside—co-conspirators like James who were privy to communications in furtherance of that conspiracy and could give color and context to their meaning. And he provided that critical information in proffers, before the Grand Jury, and, although he was not ultimately needed by the government, James was willing to testify at trial.

On balance, James gave candid answers to difficult questions about his own involvement and trajectory from serving as a United States soldier to serving as an Oath Keeper and Rhodes's deputy and security around January 6, and provided detailed information about the involvement of Rhodes and other co-conspirators. The government's knowledge of Rhodes, his state-of-mind, and how he was able to inspire followers like James was enhanced from James's cooperation. Critically, his account helped to fill in gaps in the government's understanding about the chronology of events between November 2020 through January 20, 2021—including the detailed facts regarding Rhodes's conduct and reactions after January 6th.

Much of James's information came from personal conversations with Rhodes. Among them was a conversation with Rhodes in the lead up to January 6 at co-conspirator Thomas Caldwell's Virginia farm in which Rhodes instructed everyone present to be prepared to bring

firearms into Washington, D.C. and surround the White House in the event any government actors attempted to remove President Trump from office after the Presidential Election. James acknowledged bringing weapons to the D.C. area and, if necessary, his willingness to engage in violence at Rhodes' command and his actions to support Rhodes after January 6, 2021. Another conversation occurred on January 6 when Rhodes told James that he was happy James and the other co-conspirators breached the Capitol and, later that evening, that they needed to be prepared to continue to protect the Republic by taking up arms. James also helpfully provided a firsthand account of Rhodes's frantic actions after January 6 when Rhodes and others believed law enforcement was after Rhodes—recounting Rhodes fleeing from the restaurant, attempting to divvy up thousands of dollars' of weapons, splitting up from his phone, recruiting James as personal security, and preparing to both die in a firefight with law enforcement if necessary and stockpile weaponry for an upcoming civil war.

In fact, James provided the government with the specific locations of multiple storage areas at both his residence and a private, rented storage unit that housed the weaponry and tactical equipment Rhodes amassed after January 6, 2021, and instructed James to store and prepare to distribute to Oath Keepers at Rhodes's command. On October 13, 2021, the government seized the following items with James's consent:

| **Firearms** | **Ammunition** |
|---|---|
| <ul><li>1 AR pistol chambered in 300BO</li><li>1 AR-15 chambered in 5.56</li><li>2 AR Upper Receivers - Estimate that one is chambered for 300BO, one chambered for 5.56</li></ul> | <ul><li>Approximately 2000 rounds of ammunition total were seized</li><li>1300 rounds of 300 Blackout</li><li>8 rounds of .270</li><li>Various ammunition consisting of 12ga shotgun, 9mm, and 5.56</li><li>4 Magazines filled with 300BO rounds along with loose 300BO ammunition</li></ul> |

| **Firearms Attachments** | **Other Gear** |
|---|---|
| • 1 EOTech holographic weapons sight <br> • 1 EOTech 3x magnifier <br> • 1 Magpul bipod <br> • 11 back up iron sights <br> • 3 sling mounts <br> • 1 rifle foregrip <br> • 1 XD pistol grip <br> • 1 Digital/Night camera sight <br> • 1 weapons cleaning kit <br> • 3 Rifle Scopes, variable power <br> • 11 rifle magazines for AR platform | • 2-3 prepaid phones <br> • Oath Keepers patches and hats <br> • 2 backpacks <br> • CB radio package <br> • 3 bandages with quickclot <br> 1 tourniquet |
| **Armor** <br> • 1 Plate Carrier with ballistic plates <br> • 1 Body armor with soft ballistic armor <br> • 2 Ballistic panels (1 set) <br> • 1 Ballistic Helmet | |

Taking all of these factors into account, a downward departure of approximately three levels would appropriately reflect the principles outlined above that this Court should consider in assessing the level of assistance James provided to law enforcement. Such a departure would constitute a roughly 15 percent reduction from the level 20 total adjusted offense level applicable here for the reasons stated above. That level of departure adequately accounts for the assistance provided by James to law enforcement in this matter. It is also comparatively appropriate to the departures requested by the government for cooperating co-conspirators in related cases (with the government requesting a seven-level departure for defendants Caleb Berry, Jason Dolan, and Graydon Young—all of whom testified; a five-level departure for Brian Ulrich, who testified; a four-level departure for Mark Grods, who was one of the first defendants to plead guilty; and a three-level departure requested for William Todd Wilson, who also provided substantial assistance

but similarly did not testify for various reasons). Relatedly, a three-level downward departure—
and a final sentence of 24 months—reflects a significant percentage difference from the Court's
imposed sentence for similarly-situated Jessica Watkins. In sum, a three-level departure adequately
accounts for the assistance provided by James to law enforcement in this matter and fits within the
framework the Court has carefully constructed within the related cases.

### D.  Total Adjusted Offense Level

For the forgoing reasons, should the Court adjust James's sentence pursuant to the
government's recommended upward and downward departures, the Sentencing Guidelines' total
adjusted offense level after departures should be as follows:

Count One and Count Three: 18 U.S.C. §§ 2384, 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. § 3B1.1(b) | Aggravating Role | +3 |
| U.S.S.G. § 3A1.4, n.4(A) | Terrorism | +2 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| U.S.S.G. § 5k1.1 | Substantial Assistance | -3 |
| | **Total** | **17** |

### D.    Sentencing Guidelines Recommendation

The U.S. Probation Office calculated the defendant's criminal history as category I, which
is not disputed. Accordingly, the defendant's total adjusted offense level, should the Court apply
departures under Chapter 3A1.4 n.4 and Chapter 5 as proposed above, would be level 17. At that
level, the recommended Sentencing Guidelines ranges would be 24-30 months of incarceration.
For the reasons discussed above and below, the government submits that a low-end sentence of 24
months of incarceration would appropriately reflect the nature of these offenses, the need for
deterrence, the defendant's history and characteristics (including his cooperation in this matter),
and the other factors this Court must consider at sentencing.

## VII.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, James's conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Perhaps even more alarmingly, these actions were not spontaneous for James and his co-conspirators—they were in furtherance of a seditious conspiracy hatched weeks earlier to take any means necessary, up to and including the use of force, to stop the lawful transfer of power from Donald Trump to Joseph Biden. James came to D.C. understanding the potential for, and in many ways hoping to participate in, a forcible interruption of the certification of the election. He wanted to fight and brought weapons to support the effort. And he ultimately joined the violent mob that breached the Capitol in furtherance of this conspiracy. The nature and circumstances of James's offense were of the utmost seriousness, and fully support the government's recommended sentence of 24 months of incarceration.

### B.    The History and Characteristics of the Defendant

At the time of this offense, James was gainfully employed. He had minor criminal history that does not account for any criminal history points. He is a veteran. In other words, the defendant's crimes on January 6 were an isolated incident in an otherwise public-service oriented, law-abiding life; although that fact also suggests James should have known better and makes his conduct on January 6 hard to comprehend. Indeed, James's conduct flies in the face of his

experience serving in the United States military and taking an oath to the Constitution—the very founding document that details the process he and his co-conspirators aimed to forcibly disrupt.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports the significant period of incarceration—24 months—recommended by the government. James's participation in a seditious conspiracy to forcibly oppose the lawful transfer of power and certification of a presidential election, coupled with his ultimate conduct on January 6, are the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

A sentence of 24 months of incarceration is appropriate in this case "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] At the same time, early and public acceptance of responsibility, coupled with cooperation with law enforcement, is something that should be rewarded, to encourage others to take similar responsibility for their conduct on January 6. For these reasons, a three-level or 15 percent reduction from the offense level James would have otherwise faced, which still results in a significant sentence of incarceration, achieves the goal of general deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. The government is recommending a Guidelines-compliant sentence, should the Court apply the government's recommended departure for substantial assistance to law enforcement.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). The government's recommended sentence does not create unwarranted disparities when one considers the nature of James's conduct, coupled with the fact that he accepted responsibility at the earliest possible time to very serious charges and provided

substantial assistance to law enforcement.[3]

This recommended sentence would also treat James comparably to the cooperating defendants in related cases who have been sentenced. To date, seven cooperating defendants have been sentenced (James Breheny, Jon Schaffer, Caleb Berry, Graydon Young, Jason Dolan, Brian Ulrich, and Mark Grods). All have received terms of probation, although some received periods of home confinement as a condition of probation. James stands apart from these other cooperating defendants in part because of his leadership role in the conspiracy and significant impact he had on other individuals who acted at his instruction. Like Kelly Meggs and Jessica Watkins, Joshua James used his role as a leader in the organization to mobilize others as early as November 2020, connect with Rhodes at the top and filter information downward, and to organize his particular group of actors who traveled from the southeast region of the United States and stormed into the United States Capitol in Washington, D.C. James's messages with others ahead of January 6 about what to pack and about the presence of a QRF, the videos of him leading his group on the day of January 6, and his instructions to others to "delete" and "burn" messages after January 6 all set James apart from other cooperators. Likewise, James, while willing to testify, did not testify in any of the trials. The government's decision to recommend a three-level downward departure for James, versus, for example, a five-level downward departure for co-conspirator Ulrich, is the result of that difference in the extent and nature of their cooperation and role in the offense.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

## VIII.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of May 2021. ECF 57 at 9. That estimate is far higher now.[5] James did not personally cause

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[5] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution

any documented injuries to any officers or any damage to any property. However, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that James must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6.[6] ECF 57 at 9. James's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 8, n.4.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months of incarceration, to be followed by three years of supervised release, with the special condition that the defendant pay $2,000 in restitution and the mandatory $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    _____/s/_____
Troy A. Edwards, Jr.
N.Y. Bar No. 5453741
Kathryn L. Rakoczy
Assistant U.S. Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
(202) 252-6928
Troy.Edwards@usdoj.gov

---

amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).